## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**BENJAMIN DOUGHERTY,**

Plaintiff,

**v.**                                           Case No. 4:21-cv-00269-MW-MAF

**AERIE PHARMACEUTICALS, INC.,**

Defendant.

_____/

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF 45)

Plaintiff, Benjamin Dougherty, through his counsel, files this Response in Opposition to Defendant, Aerie Pharmaceutical's Inc.'s, Motion for Summary Judgment (ECF No. 45) and states:

## I.    INTRODUCTION

During his employment, and in accord with Defendant's internal policies, Plaintiff complained to his supervisors about some of Defendant's illegal practices. For example, the U.S. Anti-Kickback Statute makes it illegal for individuals enrolled in Medicare to use manufacturer coupons, "co-pay cards," or other drug discounts with their drug plan. However, Defendant encouraged its representatives, such as Plaintiff, to drive customers to pharmacies that would cooperate in violating these

1

laws.  Plaintiff also refused to participate in Defendant's illegal activities, even though it put him at a competitive disadvantage in his workplace.

Until January 29, 2020, Defendant mostly ignored Plaintiff's objections. However, on that date, Plaintiff's supervisor called Defendant's management to alert them that he believed Plaintiff was going public with his complaints; one of the emails memorializing these facts states:

> I received a call this morning from Joe Bryant the DM in the South to report an issue that was brought to his attention. It's a post on Café Pharma regarding one of his reps Ben Dougherty and Co-pay cards. I wanted to loop you in because it references Co-pay cards and CA. Joe also mentioned that Ben was reminded back in August about leaving home made materials behind, and I have attached that email for you, along with the email from the Allergan rep to Carmen. Let me know if you and Kevin would like to jump on a call to discuss.

As partially indicated in this email, Defendant's management team scrambled to dig up whatever issues they could to fire him – such as this minor issue regarding sales material fully addressed "back in August." Defendant's efforts to dig up dirt on Plaintiff also included an overbroad "audit" that culminated in Plaintiff's termination shortly thereafter.

Defendant's claimed "decisionmaker" was Maria Lloyd, aka Maria Zanardo. Her termination letter to Plaintiff cites an audit of his expense reports as its sole reason for terminating him. However, Ms. Lloyd had previously reviewed, and approved Plaintiff's expense reports.  These facts, and many others described below, create at least a jury issue as to Plaintiff's whistleblower claim.

## II.   STATEMENT OF FACTS

### A.   Defendant's Compliance Manual Permits Complaints to Supervisors

Plaintiff may have had access to Defendant's Healthcare Compliance Manual (the "Manual"), but it was not something Defendant regularly trained its employees to use. [ECF No. 44-2, p. 93:9-14, 93:6-7] (testifying that was the first time Plaintiff looked at the manual in-depth). Regardless, the Manual does not require the use of Defendant's ethics hotline to report whistleblower violations; it expressly permits Plaintiff to report "Suspected Misconduct" directly to his supervisor. [ECF No. 44-2, p. 180] ("Company Personnel may also report Suspected Misconduct to (1) their supervisors and (2) any member of the Board of Directors.").

Moreover, the Manual guarantees that Defendant will protect whistleblowers with only a good faith belief of suspected misconduct. [ECF No. 44-2, p. 181]. Specifically, it states that Defendant "will not discharge, demote, suspend, threaten, harass, or in any manner discriminate or retaliate, directly or indirectly, against Company Personnel who, in good faith, report suspected misconduct to the Company even if the facts alleged are not confirmed by subsequent investigation." (emphasis supplied). Id. That is of course different than what Defendant now claims, i.e., that only an "actual violation" of the law is protected. cf. Defendant's Motion, p.21 (claiming that "Plaintiff is unable to meet the first element because he has failed

to elicit any facts that show he objected to or refused to participate in an "actual violation" of a law, rule, or regulation.").

### B.   Plaintiff Was Indisputably a "Top Performer"

"No doubt about it. [Plaintiff] was a top performer" - Joseph Bryant, Plaintiff's supervisor. [ECF No. 44-4, 14:4]. Accordingly, Plaintiff's 2018 performance review was excellent, scoring all "Completes" in each category of Goals/Objectives.  [ECF No. 44-2, p. 203]. Likewise, his review for 2019 was at least as good (actually better), achieving "100%" of every Team Goal. [ECF Nos. 50-42, pp. 2 and 12]. His performance even put his territory ranking at 5th in the country. [ECF Nos. 50-42, p. 17]

### C.   Plaintiff's Objections and Refusal to Participate in Illegal Activities

Plaintiff verbally objected to Defendant's illegal activities, refused to participate, and objected to them in writing. [See generally, ECF No. 44-3]. These objections, also discussed in Defendant's Motion and as further described infra by witnesses Jantz Baker and Melissa Wilson, are briefly described below.

### 1.   Objection to Providing Answers to Get Approvals

One of Plaintiff's objections occurred on about August 20, 2019, when Mr. Bryant forwarded an e-mail to Plaintiff and his team from another of Defendant's managers; that e-mail stated, "Tricare – make sure to use the new form with 'Yes, Yes, No, Yes, No' answers to get approval." [Pl. Depo. 247:22 – 249:14; Ex. 23

(ECF No. 44-3, p. 103 – 104, 163)]. This method to "get approval" was illegal because Defendant attempted to coach healthcare providers on how to get Defendant's products approved through Tricare. [Id.] Plaintiff verbally objected to this e-mail's contents to Mr. Bryant. [Pl. Depo. 229:16-23, Ex. 21, p. 2 & 4 (ECF No. 44-3, p. 85, 155 & 157)].

### 2.       Objection and Refusal to Patriciate in Co-Pay Card Fraud

Plaintiff also complained about Defendant's practice of having co-pay cards that Defendant's representatives could give to doctors who wrote Defendant's prescriptions. [Pl. Depo. 185:23 – 189:20, Ex. 21, p. 3 (ECF No. 44- 3, p. 41 – 45, 156)]. Those cards could be used only for commercial, non-Medicare, or Medicaid patients to receive a discount price on Defendant's products at pharmacies. [See Id.]. However, Defendant would encourage its employees to push certain pharmacies that would permit the use of these cards for patients on Medicare or Medicaid, which was illegal. [Pl. Depo. 186:4-8, Ex. 21, p. 3 & 4 (ECF No. 44-3, p. 42, 156 & 157)]. Notably, Joseph Bryant was personally delivering the coupons to pharmacies. [ECF No. 44-4, p.35:8-10].

In connection with this practice, upon which Plaintiff refused to participate, Defendant told his supervisor (Mr. Bryant)  that he "knew reps that were bringing in bigger numbers than me, and were not doing  it in a legal manner by using the coupons for non-qualified patients." [Pl. Depo. 236:15-18, Ex. 21, p. 3 (ECF No. 44-

3, p. 92, 156)]. Likewise, on February 25, 2020, Plaintiff sent an e-mail to Karisma Sharma about these same issues about which he had been verbally complaining. [ECF No. 44-3, p. 81-82, 148-149)]. The e-mail objects again to the co-pay card scheme, stating:

> I have been under some emotional stress the past several weeks since having a discussion regarding an online anonymous post regarding specialty pharmacies and Medicare patients in my territory and around the country. I shared an experience of one of my doctors explaining that their Medicare patients were getting their prescriptions denied by local pharmacies. **However, when those same prescriptions for the same patients were getting sent to a pharmacy outside Atlanta they were getting covered at $50.** It was only a couple patients according to the doctor. I had never pushed this pharmacy to my offices but it was pushed hard by my previous manager and I have heard it's name mentioned since she left as well. I have never or would never funnel my prescriptions to any pharmacy. When asked I may give a few a suggestions. I know there is data on where prescriptions are filled. I can guarantee my prescriptions are very spread out among my territory. **I mentioned that may not be the case in other territories as I have heard doctors crediting reps for helping all patients get their prescriptions for $50 while attending conferences and at speaker programs.**

[ECF No. 50-18] (emphasis supplied). This objection largely mirrored what Plaintiff had been verbally telling his supervisor verbally all along. [See, e.g., Pl. Depo. 236:15-18, Ex. 21, p. 3 (ECF No. 44-3, p. 92, 156)].

### 3.   Refusal to Participate in the "Tech Program"

Plaintiff also objected to Mr. Bryant about Defendant's "Tech Program," which was the process of inviting a physician's technician staff to expensive meals to teach technicians about Defendant's products. [Pl. Depo. 207:8-12, Ex. 21, p. 6

(ECF No. 44-3, p. 63, p. 159)].  Plaintiff refused to participate in the "Tech program" and objected that Defendant's representatives would teach physician technicians about the prior authorization process at these events. [Id.]

### D.    The "Report of Findings"

Despite Plaintiff's virtually perfect annual reviews and his territory's otherwise stellar performance (ranked in the top 5 of the nation), Defendant's managing agent Ms. Sharma e-mailed Charlene Davis to request a review of Plaintiff's expense reports on December 6, 2019. [ECF No. 44-6, p. 39]. Although the supposed issue regarding Plaintiff was a single lunch, Defendant chose to edit his expenses for over a year (from January 1, 2019 through to January 13, 2020). [ECF No. 44-5, p. 123 ("Report of Findings")]. Moreover, the inquiry was not limited to only Plaintiff's lunch expenses, it included all of the following in its "Scope": Concur Travel & Expense (T&E) submissions; Veeva Customer Relationship Management report (CRM); American Express (AMEX) transaction records; and Field Coach Reports (FCRs). [Id.]

Notably, the Report of Findings states that "All expense reports were reviewed and approved by Dougherty's managers; Iman Thomas (former), Maria Lloyd and Joseph Bryant." [ECF No. 44-5, p. 123]. Not only are those three people also responsible for the reports (who were not fired), but Ms. Lloyd (aka Zanardo) is the person Defendant claims made the decision to fire Plaintiff – ironically over

these same expense reports. [See Motion, p. 13] ("On or about February 14, 2020, based on the extensive compliance violations revealed by Mr. Ryan's expense report audit findings, Ms. Lloyd/Zanardo made the decision to terminate Plaintiff's employment and Ms. Sharma supported the decision.").

The Report of Findings only showed, at most, two allegedly "inappropriate" personal charges – for a total of $13.07:

> "The first charge was on Saturday, January 26, 2019 for a purchase in the amount of $10.29 at Dairy Queen; the second charge was on Sunday, April 28, 2019 for a purchase in the amount of $2.78 from Publix Supermarket (Dougherty made a notation on his expense report that this was a personal charge but failed to check the personal charge box in Concur).

[ECF No. 44-5 at p. 124].  The Report of Findings also lists supposed violations that were either easily correctible or not even Plaintiff's fault, such as this one "l. Aerie employee failed to sign SIS (68)" – something Defendant counts as 64 of its claimed "246 Policy Infractions."  [Id., See also Motion, p. 10]. Other claimed "infractions" include things so vague that they are utterly meaningless, such as: "e.  Discrepancies between Concur entries and sign-in sheet (515) documentation (46)" -- something Defendant counts as 46 more of its claimed "246 Policy Infractions." [Id.]. Moreover, none of the Report of Findings' attachments actually show Plaintiff's "falsification" of anything. [See ECF No. 44-5, p. 126 - 148].

The Report of Findings is also massively overbroad, given the supposed single expense violation by Plaintiff triggering the audit. [See ECF No. 44-5, p. 131] (an

email from attorney Charlene Davis stating in part: "Essentially, we have been requested to review all of the expenses to determine if there are any entries or associated materials which are concerning.") For example, it lists five "Field Coaching Reports," which have nothing to do with Plaintiff's expenses. [ECF No. 44-5 at p. 124]. Moreover, its date range was over a year, from January 1, 2019 to January 13, 2020. [Id. at p. 123].

Moreover, the Report of Findings' "Recommendation" was not termination. [Id. at p. 124]. Instead, it was: a. Interview and obtain a written statement from Benjamin Dougherty; b. Follow up on any new evidence/information provided by Mr. Dougherty; c. Interview managers Maria Lloyd (aka Zanardo) and Joseph Bryant regarding (1) Mr. Dougherty's performance, (2) information regarding expense report review and approvals. [Id.]. However, there is little to scant evidence that any of these recommendations were even done. [See Ryan Depo. 45-5, p. 51:21-24 regarding that Ryan does not know whether Plaintiff was interviewed].

### E.   Two Key Witnesses Support Plaintiff's Reasonable Beliefs

### 1.   Jantz Baker, Former Territory Sales Manager

Mr. Baker was a former employee of Defendant. [ECF No. 50-39, Baker Depo., 4:17-18]. He worked there from May 14, 2018, to January 2022 as a Territory Sales Manager. [Id. at 4-5:22-2]. Like Plaintiff, his direct supervisor was Joe Bryant. [Id. at 5:6-8].

a.   Medicare/Medicaid Fraud

Mr. Baker explained Defendant's Medicare/Medicaid fraud via co-pay cards and "specialty pharmacies." [Id. at 7:1-4; 8:10-13]. Generally speaking, the scheme involved pushing employees such as Plaintiff and Mr. Baker to direct physicians to use "specialty pharmacies" that would accept certain co-pay cards/coupons. [Id. at 9-10:14-2; 23:1-6]. These co-pay cards/coupons would then be used by patients to get benefits they were prevented from receiving under Medicare/Medicaid. [Id. at 9:21-25]. This was something the sales managers, such as Mr. Baker and Plaintiff, to do. [Id. at 10:6-11]. The Federal government would end up paying more for the product. [Id. at 21:18-24].

b.   Expense Reports

Mr. Baker testified that, like Plaintiff, he had expense reports while working for Defendant; however, unlike Plaintiff, he was allowed to go back and correct or change if there was anything wrong with them. [Id. at 11:14-17]. He also testified he was unaware of anyone fired over their expense reports other than Plaintiff. [Id. at 11-12:23-3]. Moreover, after an expense report is submitted, four different people look it over; so "it's very strange that [Plaintiff] got fired over allegedly doing something wrong on his expense report when it was approved by four people." [Id. at 38-39:23-1]. If Plaintiff was to be fired for it, then so should have his manager, regional manager, and account manager. [Id. at 39:4-7].

c.      TRICARE Techs

Mr. Baker also testified about the fraud regarding the TRICARE techs. [Id. at 15:3-9]. Defendant wanted to get their products sold through certain doctors, so they would tell the doctors to answer "yes, yes, no, yes, no" answers to get approval on prior authorization forms – whether those answers were true or not. [Id. at 15:3-9, 12-20; 18-19:22-10; 49:17-23]. Giving direction to a healthcare provider, such as TRICARE, on how to answer questions could result in marketing a product to a patient that might not even need it. [Id. at 16:11-17].

d.      Signing-In Procedures

Regarding the sign-in forms that Defendant is trying to use against Plaintiff, nurses would show up at meetings and sign in the name of the doctor they worked for instead of themselves. [Id. at 40:6-15]. Mr. Baker never knew of anyone to get in trouble for that other than Plaintiff. [Id. at 40:18-19]. It's simply impossible for every name to be kept up with by the representatives. [Id. at 41:11-14].

e.      Defendant's Relatively Small Size

Finally, Mr. Baker also testified about Defendant's relative size. [Id. at 29:24-25]. Specifically, he testified about how information travels inside Defendant's ranks: "You know, it's a real small company and everybody talks." [Id.].

**2.      Melissa Wilson, Former Direct Sales Manager**

11

Ms. Wilson worked for Defendant as a District Sales Manager. [ECF No. 50-41, Wilson Depo. 4:19-23]. Like Plaintiff, she was also concerned about the coupon/voucher program being used by Medicaid patients. [Id. at 5:20-25]. She also believed informing them about the "yes, yes, no, yes, no" answers would be illegal. [Id. at 20:21-25]. Like Plaintiff, she considers her objections brought about her termination. [Id. at 13:18-22]. She also testified that expense report errors, such as coding errors, would happen, and the employees would often be given a chance to correct them [Id. at 56-57:22-5] and that audits of expense reports were unusual. [Id. at 57-58:17-7].

### F.      Defendant is Suddenly Alarmed by Plaintiff's Objection

Plaintiff's objections, especially about using co-pay cards while being a Medicare patient, would carry "huge consequences" like fines or even revoking Defendant's coverage.  [ECF No. 50-40, Hockman Depo., 25:13-24]. In light of these serious consequences, it is no surprise that Mr. Bryant became alarmed about what he found on the website CaféPharma (http://www.cafepharma.com, a website that includes message boards). [See ECF No. 50-42, p.19].

On the morning of January 29, 2020, Joe Bryant (Plaintiff's supervisor) called Andrew Allen (Defendant's Compliance Officer[1]) about Plaintiff. [Id.] ("I received a call this morning from Joe Bryant…"). Later that same day, at 12:17pm, Mr. Bryant

---

[1] ECF No. 44-9, p. 7:16-17.

sends an e-mail to Mr. Allen, with a copy to Maria Lloyd/Zanardo) mysteriously digging up a fully resolved complaint against Plaintiff from five months prior (August 15, 2019) about his sales material. Notably, Maria Lloyd, who also goes by the name of Maria Zanardo, was the person Defendant claims made the decision to terminate Plaintiff.  [ECF No. 44-2, p. 13:13-19; 45, p. 13].

Less than an hour after sending the above-referenced e-mail, on January 29, 2020, at 1:08pm, Andrew Allen e-mailed Charlene Davis (head of Compliance[2]) with a copy to Kevin Ryan (author of the February 6, 2020 "Report of Findings"),[3] stating that Mr. Allen received a call from District Manager Joe Bryant "to report an issue that was brought to his attention." [ECF No. 50-42, p. 23]. That "issue" was a CaféPharma post mentioning Plaintiff and his complaint about the co-pay cards. [See Id., and its attachment with the CaféPharma post stating in part: "the Southern reps seem to be having specialty pharmacies give everyone a 50.00 coupon price. Good thing is pharmacies names have been submitted and Ben D. Your name has also. Whistleblower at its best."].

G.    **Within about Two Weeks, Defendant Decides to Terminate**

According to Defendant: "On or about February 14, 2020, based on the extensive compliance violations revealed by Mr. Ryan's expense report audit

---

[2] ECF No. 44-9, p. 8:4-6.
[3] ECF No. 44-5, p. 123.

findings, Ms. Zanardo made the decision to terminate Plaintiff's employment and Ms. Sharma supported the decision." Defendant's Motion [ECF No. 45, p. 13]. However, Review's recommendation was only that further investigation was required, not that he be terminated. [ECF No. 44-5, p. 123 (the "Report of Findings")]. Furthermore, Plaintiff would have been more than willing to fix errors in his expense reports, as he did other minor issues during his employment. [ECF No. 50-42, paragraph 7, p. 2].

More evidence about the oddity of firing Plaintiff for his expense reports came from Mr. Hockman, an employee of Defendant for over six years. [ECF No. 50-40, Hockman Depo., 4:13-19]. Mr. Hockman supervised Plaintiff during the last month of Plaintiff's employment. [Id. at 5:5-7]. He testified that it was the "normal course of business" that people would have to make corrections to their expense reports. [Id. at 7:9-13]. Regardless, Defendant terminated Plaintiff in a letter from Ms. Sharma (VP Human Resources) dated March 5, 2020. [ECF No. 44-3, p. 150].

## III. PLAINTIFF'S FWA CLAIM PRESENTS JURY ISSUES

The Florida Supreme Court requires the Florida Whistleblower Act (FWA) to be given a liberal interpretation. Therefore, the FWA protects employees who complain about actual and suspected[4] violations of a law, rule, or regulation. Thus,

---

[4] See Aery v. Wallace Lincoln-Mercury, LLC, 118 So.3d 904, 916 (Fla. 4th DCA 2013) ("all that is required is that the employee have a good faith, objectively reasonable belief that h[is] activity is protected by the statute.")

the FWA protected Plaintiff's objections, and his termination was unlawful.

## A.   <u>Plaintiff Engaged in Protected Activities</u>

Defendant's Motion relies heavily on the notion that to make out a case under the FWA, Plaintiff must prove an "actual violation" of the law. For example, Defendant claims on page 21 of its Motion that: "In the Eleventh Circuit <u>and in this Court, the law is clear</u> – a claim under § 448.102(3) of the FWA requires a showing of an <u>actual violation</u> of a law, rule, or regulation." (emphasis supplied, footnote omitted).

Contrary to Defendant's assertion, this Court held that proof of an actual violation of the law is not required under the FWA. <u>See</u> <u>O'Steen v. Florida Sports Foundation, Inc.</u>, Case No. 4:19cv106-MW/MAF (N.D. Fla., June 12, 2020). Instead, this Court decided to follow <u>Aery v. Wallace Lincoln-Mercury, LLC</u>, 118 So. 3d 904, 916 (Fla. 4th DCA 2013) (4th DCA 2013) (interpreting the first element of an FWA claim to mean that a plaintiff objecting to the employer's conduct need only have "a good faith, objectively reasonable belief" that the employer's activity was illegal). In <u>O'Steen</u>, this Court analyzed the issue and found:

> The parties dispute whether the FWA requires Plaintiff to prove she reported an actual violation of law, or only that she had a good-faith belief she was reporting an actual violation of law irrespective of whether Defendant's conduct was actually illegal. The Supreme Court of Florida has instructed courts to construe the FWA broadly and to favor access to its remedy. <u>Irven v. Dep't of Health and Rehab. Servs.</u>, 790 So. 2d 403, 406 (Fla. 2001); <u>Martin Cty. v. City of Edenfield</u>, 609 So. 2d 27, 29 (Fla. 1992). The Supreme Court of Florida has not,

however, held either standard is the correct one to apply in FWA cases. **Florida's Fourth District Court of Appeal has held the "good faith" standard is correct.** Aery v. Wallace Lincoln-Mercury, LLC, 118 So. 3d 904, 916 (Fla. 4th DCA 2013). Florida's Second District Court of Appeal has disagreed in a dictum, Kearns v. Farmer Acquisition Co., 157 So. 3d 458, 465 (Fla. 2d DCA 2015), but this neither disturbs nor conflicts with the Fourth District's decision. **This Court's duty is thus to follow Aery.** See Winn-Dixie Stores, Inc. v. Dolgencorp, LLC, 746 F.3d 1008, 1021 (11th Cir. 2014) (explaining federal courts must follow the decisions of a state's intermediate appellate courts where the state supreme court has not ruled on the correct interpretation of the law).

O'Steen v. Fla. Sports Foundation, Inc., Case No. 4:19-cv-106-MW-MAF, Docket Number 48 at pp. 7-8 (emphasis supplied) This Court in O'Steen went even further, adding that "even if Aery and Kearns were in express and direct conflict, this Court would reject Kearns and apply Aery in obedience to the Supreme Court of Florida's instruction to construe the FWA liberally." Id. at footnote 1.

Naturally, as Defendant is wrong about the applicable standard, its conclusion (that summary judgment is proper) is also wrong. As explained below, there are more than sufficient facts supporting Plaintiff's case for resolution by a reasonable jury.

### 1. The Good Faith Belief is the Correct Standard

Defendant is simply wrong about the applicable standard to the FWA. As discussed below, an actual violation of the law is not required.

a.    The Aery Holding - Good Faith Belief

The FWA is a remedial statute that must be liberally construed to grant access to its remedies. The Golf Channel v. Jenkins, 752 So. 2d 561, 565-6 (Fla. 2000) ("paragraph 448.103(1)(c) should be liberally construed in favor of granting access to the remedy provided by the Legislature"). For many years, courts disagreed over the "actual violation" versus "good-faith belief" standards. Courts favoring the "actual violation" standard followed the line of cases represented by White v. Purdue Pharma., Inc., 369 F. Supp.2d 1335, 1337 (M.D. Fla.2005) ("[A] Plaintiff, in order to prevail under a Florida Whistle-Blower action ... must prove that the activity, policy or practice objected to is, in fact, in violation of a law, rule or regulation."). Courts favoring the "good-faith belief" standard followed the line of cases represented by Padron v. BellSouth Telecommunications, Inc., 196 F. Supp.2d 1250, 1256 (S.D. Fla.2002) ("Statutorily protected participation is established if Plaintiff can show that she opposed an unlawful employment practice which she reasonably believed had occurred").

A Florida appeals court finally ruled in Aery v. Wallace Lincoln-Mercury, LLC, 118 So.3d 904, 916 (Fla.4th DCA 2013) ("all that is required is that the employee have a good faith, objectively reasonable belief that h[is] activity is protected by the statute.") (bracket in original)(quoting, Luna v. Walgreen Co., 575 F. Supp.2d 1326, 1343 (S.D. Fla.2008). Federal courts began to fall in line behind

Aery. Hernandez v. Publix Super Markets, Inc., 11 F. Supp.3d 1177 (S.D. Fla.2014) ("Aery is the only Florida intermediate appellate court to have addressed the standard of proof in a FWA claim. As a federal court applying state law, the Court is bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise") (internal quotation marks omitted); Odom v. Citigroup Global Markets, Inc., 62 F. Supp.3d 1330, 1336 (N.D. Fla. 2014) ("Aery is the only binding statement of authority on the matter.").

b.    The Kearns Dicta

Some confusion arose from the decision in Kearns v. Farmer Acquisition Co., 157 So. 3d 458 (Fla. 2d DCA 2015). After devoting 1401 words to arguing that Aery was wrongly decided, the Kearns court went on to explain that the plaintiff's good-faith reasonable belief was irrelevant to the case at hand because there was a jury question on the existence of an actual violation.

> [W]e agree with the Employer that under section 448.102(3) Kearns must prove that he objected to an actual violation of law or that he refused to participate in activity that would have been an actual violation of law. Thus, we are not persuaded by the Fourth District's opinion in Aery. **However, the issue of which standard applies is not determinative** because we conclude Kearns presented evidence that, when viewed in the light most favorable to him, establishes an actual violation of the law.

18

Id., 465. Emphasis supplied. The court could have simply said "there is an actual violation so we need not discuss whether a good-faith reasonable belief would have been enough," instead of penning 1401 words of dicta challenging Aery.

Predictably, employers seized upon Kearns as a decision creating conflict with Aery, thus allowing federal courts and state trial courts outside the 2nd DCA and 4th DCA to choose between the two outcomes until the Florida Supreme Court could resolve the split. But there was no real split because the Kearns court's analysis was merely a prediction of how a future case might be decided if that same three-judge panel happened to reassemble to hear a similar case in the future. The finding of an actual violation (or at least a jury question requiring remand on the actual violation) made the Aery discussion irrelevant to the Kearns outcome. Magistrate Judge Pizzo laid out this argument in Canelejo v. ADG, LLC, 2015 WL 4992000 (M.D. Fla. Aug. 19, 2015). After quoting the Kearns court's own language that "which standard applies is not determinative," the court identified the language disagreeing with Aery as "dicta," adding: **"'[D]icta is not binding** on anyone for any purpose.'" Therefore, **Kearns does not constitute an intervening change in controlling law** on whether the FWA requires a plaintiff to prove an actual violation." Id., *2, (citations and parentheticals omitted). Numerous other courts agree.[5]

---

[5] Accord, Burns v. Medtronic, Inc., 2016 WL 3769369 (M.D. Fla. July 12, 2016) ("Aery remains the controlling law on the issue because the actual violation standard

Because <u>Kearns</u> is dictum, this Court is bound to follow <u>Aery</u>. <u>See Aurora Loan Servs. LLC v. Senchuk</u>, 36 So. 3d 716, 721 (Fla. 1st D.C.A. 2010) ("[I]n the absence of inter-district conflict or contrary precedent for the [S]upreme [C]ourt, the decision of a district court of appeal is binding throughout Florida."). Further, even if Aery and Kearns were in express and direct conflict, this Court should reject Kearns and apply Aery because Courts are required to construe the FWA liberally. <u>The Golf Channel v. Jenkins</u>, 752 So. 2d 561, 565-6 (Fla. 2000) (FWA is a remedial statute that must be liberally construed to grant access to its remedies). Thus, the "good-faith belief" standard is the correct one.

c.   <u>O'Steen v. Florida Sports</u>

As discussed above, this Court's well-reasoned decision on this very issue was given in <u>O'Steen v. Florida Sports Foundation, Inc.</u>, Case No. 4:19cv106-MW/MAF

---

in Kearns was discussed in dicta."); <u>Rivera v. Spirit Airlines, Inc.</u>, 2020 WL 491454, *2 (S.D. Fla. January 30, 2020) (noting the conflict with Kearns and applying Aery as binding); <u>Ritenour v. AmeriGas Propane, Inc.</u>, 2019 WL 2008675, at *6 (S.D. Fla. March 15, 2019) (applying Aery as controlling law); <u>Tillman v. Advanced Public Safety, Inc.</u>, 2016 WL 11501680, at *4 n. 1 (S.D. Fla. Nov. 14, 2016) (Marra, J.) (same); <u>Thomas v. Tyco Int'l Mgmt. Co.</u>, LLC, 262 F. Supp. 3d 1328, 1340 n. 6 (S.D. Fla. 2017) (Marra, J.) (same) (<u>citing Burns v. Medtronic, Inc.</u>, 2016 WL 3769369, at *5 (M.D. Fla. July 12, 2016) and <u>Canalejo v. ADG, LLC</u>, 2015 WL 4992000, at *2 (M.D. Fla. Aug. 19, 2015)); <u>Villaman v. United Parcel Service, Inc.</u>, 2019 WL 922704, *6 n. 2 (S.D. Fla. Feb. 8, 2019) (Altonaga, J.) ("For purposes of summary judgment, the Court assumes the reading in Aery is the correct one—Plaintiff must only prove she had a good-faith reasonable belief in the violation of law at the time she objected to Defendants.").

(N.D. Fla., June 12, 2020). There, the Court analyzed the issue and found that <u>Aery</u>

is correct, as cited above.

d.   <u>Other Decisions Are Incorrect</u>

Decisions such as <u>Vuolo v. MHM Health Pros. LLC</u>, No. 4:21-CV-473-AW-

MAF, 2022 WL 2289129, at *2 (N.D. Fla. May 24, 2022) hold that an actual

violation of the law is required, but based upon erroneous assumptions.  In <u>Vuolo</u>,

the Court noted that this court generally "must adhere to the decisions of the state's

intermediate appellate courts" but not if "there is some persuasive indication that the

state's highest court would decide the issue otherwise." <u>Id.</u>, <u>citations omitted</u>.

However, as explained above, courts have struggled with this issue for at least

20 years now without the Florida Supreme Court stepping in to overrule <u>Aery</u>.  <u>See,</u>

<u>e.g.</u>, <u>Padron v. BellSouth Telecommunications, Inc.</u>, 196 F. Supp.2d 1250, 1256

(S.D. Fla.2002) ("Statutorily protected participation is established if Plaintiff can

show that she opposed an unlawful employment practice which she reasonably

believed had occurred").  "[T]he Florida Supreme Court has not resolved the

disagreement." <u>Butterfield v. JetBlue Airways Corp.</u>, No. 20-13473, 2022 WL

291003, at *5 (11th Cir. Feb. 1, 2022).  That the Florida Supreme Court has not acted

so long to overturn the ruling in <u>Aery</u> is an indication that it has chosen not to decide

the issue otherwise.

21

e.   Defendant's Own Whistleblower Policy

Defendant uses its Manual as a sword against Plaintiff, implying he did not use the "ethics hotline" referred therein.[6] However, Defendant ignores that its Manual guarantees that Defendant "will not discharge, demote, suspend, threaten, harass, or in any manner discriminate or retaliate, directly or indirectly, against Company Personnel who, in good faith, report suspected misconduct to the Company even if the facts alleged are not confirmed by subsequent investigation." (emphasis supplied). [ECF No. 44-2, p. 181]. Thus, an interpretation of the FWA to require a good faith (not actual) belief is not only the correct result under the law, it is exactly what Defendant promises to its employees. It is amazing that an employer could publish to its employees that they will be protected as a whistleblower upon their good faith belief that a law was violated, only to then come to Court and argue that an actual violation is required (plus, seek attorneys' fees against the employee bringing such an action).[7] To that end, Defendant should be equitably estopped from

---

[6] Of course, this lawsuit involves the private whistleblower act (Fla. Stat. Sec. 448.102). By way of contrast to the public whistleblower act, Fla. Stat. Sec. 448.102 is very broad – such as its protections for people who "Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." Fla. Stat. Sec. 448.102(3). Defendant could not limit these protections via its Policy Manual and require Plaintiff to complain or object in a specific manner for Fla. Stat. Sec. 448.102 to apply.

[7] Florida Statute § 448.104 permits a court to award reasonable attorneys' fees to the prevailing party under the FWA.

now clamming Plaintiff's whistleblowing activity is unprotected because it allegedly did not involve an actual violation of a law, rule or regulation.

### 2.    Plaintiff Engaged in Protected Activity

The FWA, Section 448.102(3), states that an employer may not take any retaliatory personnel action against an employee because the employee has "Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." As discussed above, the "good-faith belief" standard is the correct one. Thus, all "that is required is that the employee have a good faith, objectively reasonable belief that h[is] activity is protected by the statute." Aery, 118 So.3d at 916. Plaintiff did both; he objected and refused to participate in Defendant's activity, policies, or practices, such as his objections to the instruction to Defendant's manager's instructions "Tricare – make sure to use the new form with 'Yes, Yes, No, Yes, No' answers to get approval," his objection and refusal to patriciate in co-Pay card fraud, and his objections and refusal to refusal to participate in the "Tech Program."

### B.    Plaintiff Can Establish a Casual Connection

### 1.    Defendant Was Aware of the Protected Expression

A plaintiff may satisfy the causal link in a retaliation case by establishing that the employer was actually aware of the protected expression at the time it took the adverse employment action. Clover v. Total Sys. Serv. Inc., 176 F.2d 1346, 1354

(11th Cir.1999). "Such awareness may be established either by direct evidence, or by circumstantial evidence. . .." Gary v. Hale, 212 F. App'x 952, 957 (11th Cir. 2007).

Here, Defendant's "decisionmaker" (Maria Lloyd/Zanardo) was copied on Mr. Bryant's e-mail of January 29, 2020 at 12:17 pm – the same day Mr. Bryant became aware of the CaféPharma post naming Plaintiff and repeating his whistleblower complaints. That email states, ominously, "Thanks for talking with me today. Below is the email about the call we had with Ben back in August." Next thing to happen is an email at 1:08 pm, mysteriously omitting Ms. Lloyd/Zanardo, still talking about the August "issue," and attaching the CaféPharma post mentioning the co-pay cards. Likewise, as acknowledged by Mr. Baker, the size of Defendant's company was very small, and "everybody talks." [ECF No. 50-39, Baker Depo., 29:24-25]. ("You know, it's a real small company and everybody talks."). These facts alone could lead a reasonable juror to conclude, by way of circumstantial evidence, that Ms. Lloyd/Zanardo became aware of Plaintiff's objections on or before January 29, 2020.

### 2.    Timing

Even absent evidence of actual knowledge, a "very close" temporal proximity between the protected activity and the differential treatment may suffice. See Fitzgibbon v. Fulton Cnty., Ga., 842 F. App'x 385, 389 (11th Cir. 2021) (quoting

Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007)); Debe v. State Farm Mut. Auto. Ins. Co., 860 F. App'x 637, 639-40 (11th Cir. 2021) (a one-month gap may qualify as "very close"). Here, the timing between Mr. Bryant's awareness of the CaféPharma post and Plaintiff's termination was well within a month and thus qualifies as "very close."

Within about a week of these January 29, 2020 emails, on February 6, 2020, Kevin Ryan published his "Report of Findings," slamming Plaintiff and his supposed "246 Policy Infractions". [ECF No. 44-5, p. 45]. On February 14, 2020, without giving Plaintiff any chance to rectify the alleged errors in his expense reports (which had previously been approved by at least 3 of his supervisors, including Ms. Lloyd/Zanardo herself), Defendant decided to terminate Plaintiff. All of these things occur within about 2 weeks' time, are thus "very close," and without more can lead a reasonable juror to find causation.

### 3.    Cat's Paw

The "cat's paw" theory renders an employer liable if those persons exhibiting discriminatory animus influenced or participated in the ultimate decision to terminate, even if those persons were not the formal decision-makers. See McKenna v. City of Philadelphia, 649 F.3d 171, 177–78 (3d Cir.2011) cert. denied, 132 S.Ct. 1918, 182 L.Ed.2d 773 (2012) ("A 'cat's paw' or 'subordinate bias' theory of liability is 'one in which [the plaintiff seeks] to hold his employer liable for the animus of a

nondecisionmaker.'"). As the Supreme Court explained in <u>Staub v. Proctor Hospital</u>, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011), when evaluating the "cat's paw" theory with traditional tort-law concepts of proximate cause, "the ultimate decisionmaker's exercise of judgment [does not] automatically render [ ] the link to the [non-decisionmakers'] bias 'remote' or 'purely contingent.' The decisionmaker's exercise of judgment is also a proximate cause of the employment decision." <u>Staub</u>, 131 S.Ct. at 1192 (<u>citing</u> <u>Sosa v. Alvarez–Machain</u>, 542 U.S. 692, 704, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004)).

Here, even assuming Maria Lloyd/Zanardo was somehow kept in the dark by Andrew Allen, Charlene Davis, and Kevin Ryan, she was simply doing their bidding. The e-mails of January 29, 2020 show that Defendant's management conspired to dig up old complaints about Plaintiff, complaints that had been perfectly resolved, and/or new ones with an expansive years-long "review" of Plaintiff's expense reports. Presuming for the moment that Defendant's management fed Ms. Lloyd/Zanardo with enough "information" to position her against Plaintiff would not insulate Defendant from liability because their motive was Plaintiff's whistleblowing activities.

### 4.    Other Evidence of a Causal Link

The Eleventh Circuit "construe[s] the causal link element broadly so that 'a plaintiff merely has to prove that the protected activity and the negative employment

action are not completely unrelated.'" <u>Goldsmith v. Bagby Elevator Co., Inc.</u>, 513 F.3d 1261, 1278 (11th Cir. 2008) (quoting <u>Olmsted v. Taco Bell Corp.</u>, 141 F.3d 1457, 1460 (11th Cir. 1998)). Accordingly, "a plaintiff may rely upon a broad array of evidence to [illustrate a causal link]." <u>Abramson v. William Paterson Coll. of N.J.</u>, 260 F.3d 265, 289 (3d Cir. 2001). "The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly content-specific." <u>Kachmar v. SunGard Data Systems, Inc.</u>, 109 F.3d 173, 178 (3d Cir.1997).

Here, Defendant fired a top five performing representative with excellent reviews over, essentially, $13.07 in alleged AMEX expense errors. Moreover, even the Report of Findings on his expenses does not recommend his termination; instead of following that recommendation in the report, Plaintiff was fired anyway. It simply makes no sense and lends to a convincing mosaic that Defendant just wanted Plaintiff out because of their perception that Plaintiff's whistleblowing was attracting public implications.

### C.   <u>Plaintiff Has Shown Pretext</u>

As its sole stated reason for firing Plaintiff, Defendant cites its expansive audit of Plaintiff's expenses. However, a reasonable juror could find that this audit, and its results, were simply an effort by Defendant to build a case to terminate him.

### 1.    Sham Investigation

The audit of Plaintiff's expenses was a sham; as discussed supra, it is the epitome of making a mountain out of a molehill. Moreover, as shown by the emails of January 29th, Defendants even sought to pull in other old, minor allegations against Plaintiff. These efforts can lead a reasonable jury to find the "Report of Findings" was a sham. See  Pullom v. United States Bakery, 477 F. Supp. 2d 1093 (D. Oregon 2007)(reasonable jury could find that the defendant issued the corrective actions to a plaintiff in an effort to build a case to terminate her for reporting harassment). Notably, Kevin Ryan – the author of the Report of Findings, was actually copied on the January 29, 2020 e-mail regarding Plaintiff's whistleblowing activities. See Monika Mueller v. Daugherty Sys., Inc. d/b/a Daugherty Bus. Sols., No. 1:18-CV-3358-MLB, 2021 WL 3754582, at *8 (N.D. Ga. June 14, 2021) (finding that it was reasonable for a jury to conclude Plaintiff's poor performance was a pretext and a result of "a sham investigation to paper Plaintiff's file, exonerate management, and hide retaliation as the actual motive for termination.") Thus, Mr. Ryan indisputably knew about Plaintiff's whistleblowing activities when he prepared this Report of Findings. See also, supra argument regarding the Cat's Paw theory.

### 2.    Plaintiff's Stellar Work Performance

"No doubt about it. [Plaintiff] was a top performer," per Joseph Bryant. Plaintiff's 2018 and 2019 performance reviews were excellent. His performance put

his territory ranking at 5th in the country. There was simply no good reason to fire such a top performer, and the Report of Findings does not begin to justify it.

### 3. Plaintiff Could Have Fixed the Expense Report "Errors"

Plaintiff could have and would have simply fixed his expense report errors if there were any. Mr. Hockman testified that it was the "normal course of business" that people would have to make corrections to their expense reports. Moreover, even the Report of Findings itself did not result in a recommendation of termination. Thus, the supposed reason for Plaintiff's termination (i.e., the findings of the Report of Findings) are belied by the actual Report itself. This also shows the termination, citing only the Report of Findings, was a farce.

### 4. The Decisionmaker Approved Plaintiff's Expenses

Finally, in an incredible twist, Defendant's named decisionmaker (Maria Lloyd/Zanardo), along with his supervisors, actually had approved the same expense reports that supposedly justify Plaintiff's termination. This, of course, shows her reasons for terminating Plaintiff are pretextual because nobody else suffered such consequences as did Plaintiff.

### D. Even Assuming Plaintiff Cannot Prevail Under McDonnel Douglas, A Jury Issue Still Exists Under the Convincing Mosaic Standard

Defendant argues for the application of the <u>McDonnell Douglas</u> framework. However, the McDonnell Douglas framework "is not the sine qua non for a plaintiff to survive summary judgment in a discrimination case." <u>Sims v. MVM, Inc.</u>, 704

29

F.3d 1327, 1333 (11th Cir. 2013). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." See Marquardt v. Ocean Reef Cmty. Ass'n, No. 19-10110-CIV, 2020 WL 1812303, at *1 (S.D. Fla. Apr. 9, 2020) (applying the convincing mosaic standard to a claim bought under the Florida Whistleblower Act, stating that "Plaintiff argues her case survives summary judgment as analyzed either under the McDonell Douglas framework or under Smith's "convincing mosaic" standard. The Court agrees."); see also Jenkins v. Nell, 26 F.4th 1243, 1251 (11th Cir. 2022)(no comparator but convincing mosaic standard applied).

. Therefore, even if the McDonnell Douglas path is foreclosed, a plaintiff may nevertheless survive summary judgment if he can "present[ ] circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Silver v. City of Pembroke Pines, No. 21-CV-61148-RAR, 2022 WL 2788484, at *6 (S.D. Fla. July 15, 2022), citing Johnson v. Airbus Def. & Space Inc, 858 F. App'x 304, 310 (11th Cir. 2021) (internal quotations omitted). Under that framework, "a triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Id. (alterations omitted) (emphasis added).

As the <u>Jenkins</u> court recently held, taken as a whole, the evidence paints at least a jury issue under the convincing mosaic standard. The facts surrounding Plaintiff's (a top performer's) bizarre termination are more than sufficient to establish a convincing mosaic of circumstantial evidence. Such a mosaic would allow a jury to infer intentional retaliation by the decisionmaker regardless of the <u>McDonnell Douglas</u> framework.

### E.  <u>Alleged "After Acquired Evidence"</u>

#### 1.  The Alleged Evidence is not Relevant

Defendant's alleged evidence about Plaintiff's extramarital affair is not relevant to why it terminated him. <u>See</u>, e.g., <u>Lloyd v. Georgia Gulf Corp.</u>, 961 F.2d 1190, 1197 (5th Cir.,1992) ("Georgia Gulf sought to introduce testimony by Edward Schmitt regarding aspects of Lloyd's performance that Tom Marshall had no knowledge of when he decided to fire Lloyd. . . . Marshall's stated motivation for firing Lloyd, poor performance, could only have been based on events he knew of at the time. It was not an abuse of the district court's discretion to exclude evidence of Lloyd's performance that did not affect Marshall's decision."); <u>see also</u> <u>Eastland v. Tennessee Valley Authority</u>, 704 F.2d 613, 626 (11th Cir.,1983) rehearing denied and opinion modified on other grounds by <u>Eastland v. Tennessee Valley Authority</u>, 714 F.2d 1066 (11th Cir. 1983) (The Eleventh Circuit highlighted the evidence in the record that the person who made the hiring decision did not know the relative

qualifications of the candidates, and concluded that "TVA's decision cannot be defended on the basis of the relative qualifications of the applicants if these qualifications were not considered."). Likewise, such "evidence" is not relevant to Plaintiff's termination.

### 2.  Defendant is Just "Digging up Dirt" on Plaintiff

Defendant's Seventh Affirmative Defense claims: "Plaintiff's claims for damages are barred (or limited) to the extent it is shown he engaged in misconduct prior to, during, or in connection with his application for employment and/or employment that otherwise would have resulted in his discharge or his not being hired if such conduct were then known to Defendant." [ECF No. 23, p. 10]. However, at the time this was pled (November 9, 2021), Defendant did not know of any such misconduct – it had to dig that up during litigation.[8]

This "digging up dirt" evidence, in which Defendant was soliciting negative information about Plaintiff, is sufficient to raise an issue of fact that she was terminated due to her gender or in retaliation for engaging in protected activity. See

---

[8]  It was unnecessary to plead this an affirmative defense if Defendant did not intend to "prove" it at some point. See, e.g., Wells v. Orange Cnty. Sch. Bd., No. 6:05CV479ORL28DAB, 2006 WL 4824479, at *3 (M.D. Fla. Nov. 7, 2006) ("The School Board's Motion to Amend its Answer to add after-acquired evidence is late, coming past the close of discovery, and well after the Board first learned of Plaintiff's conduct during her July 27, 2006 deposition. ECF No. 45, filed October 5, 2006. . . . The tardiness in filing the Motion to Amend can be ameliorated by allowing Plaintiff additional discovery.").

Giardina v. Lockheed Martin, Corp., 2003 WL 21634934, *10 (E.D. La. 2003)(trying to "dig up dirt" on the plaintiff raises an issue of fact that she was terminated on the basis of her sex); see also Ponce v. Cingular Wireless, LLC, 2005 WL 5454213 (S.D. Fla. 2005)(if a jury found the "campaign of hatred" to "dig up dirt" on the plaintiff resulted from animus towards a protected group, it could reasonably find that the defendant took action against the plaintiff because of her national origin and not job performance).

### 3.   The Potential Prejudice To Plaintiff Outweighs Its Probative Value

Even assuming Defendant's evidence of some romantic relation was admissible, the prejudicial effect would outweigh its probative value under Rule 403. Thus, it would be inadmissible – or at the very least justify a bifurcated trial.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Summary Judgment Motion should be denied.

Respectfully submitted,

/s/  Marie A. Mattox
Marie A. Mattox [FBN 07396875]
MARIE A. MATTOX, P.A.
203 North Gadsden Street
Tallahassee, FL 32301
Telephone: (850) 383-4800
ATTORNEY FOR PLAINTIFF

## WORD COUNT CERTIFICATE

I HEREBY CERTIFY that the foregoing contains 7951 words and is typed in 14 point font.

/s/  Marie A. Mattox
Marie A. Mattox

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to all counsel of record by CM/ECF this 3rd day of October 2022.

/s/  Marie A. Mattox
Marie A. Mattox